## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　　Plaintiff,<br><br>　　　v.<br><br>BP p.l.c.,<br><br>　　　　　　Defendant. | CIVIL ACTION<br><br>NUMBER:<br><br>SECTION: |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

## SUMMARY

1.　　　On April 20, 2010, an explosion occurred on the offshore oil rig Deepwater Horizon (the "Deepwater Horizon" or the "rig") leased by a subsidiary of BP p.l.c. ("BP"). Following the explosion, oil soon began spilling into the Gulf of Mexico.  In three public filings furnished to the Commission and made available to investors, BP misled investors by misrepresenting and omitting material information known to BP regarding the rate at which oil was flowing into the Gulf and, thus, the resulting liability for the oil spill.

2.　　　On April 20, 2010, high pressure methane gas was released onto the rig and exploded, engulfing the Deepwater Horizon in flames.  The Deepwater Horizon was a nine-year-old semi-submersible mobile offshore drilling unit and dynamically positioned drilling rig that was designed to operate in waters up to 8,000 feet deep and drill down to approximately 30,000 feet.  During April 2010, the Deepwater Horizon was located above the Macondo Prospect, in the Mississippi Canyon Block 252 of the Gulf of Mexico in the United States exclusive

economic zone, about forty-one miles off of the Louisiana coast.  A BP subsidiary was the operator, principal developer, and sixty-five percent owner of the Macondo Prospect.

3.   As a result of the explosion, eleven crew members died.  For approximately thirty-six hours following the explosion, the rig remained on the surface of the water, engulfed in flames.  On the morning of April 22, 2010, the rig sank approximately 5,000 feet to the seafloor.  As the Deepwater Horizon sank, the riser pipe (the pipe that connected the oil wellhead at the seafloor) disconnected from the rig.  The detached end of the riser pipe sank to the seafloor, still connected at the other end to the wellhead.  This created a bend, or "kink," in the riser pipe directly above the wellhead.

4.   For a day after the rig sank, no oil was believed to be leaking from the well, and the small oil slick on the surface of the water was thought to be oil that had been in the riser pipe at the time of the explosion.  On the evening of April 23, 2010, a video streaming to the BP crisis center from a remotely operated subsea camera revealed that the open end of the riser pipe, which was now lying on the seafloor, was leaking oil into the Gulf of Mexico.

5.   Following the discovery that oil was spilling into the Gulf of Mexico, BP materially misrepresented and understated the estimated range of flow rate of oil leaking from the well in three public filings furnished to the Commission.  BP also omitted material information from these three public filings regarding its own internal data, estimates, and calculations indicating that the flow rate estimate contained in these filings was unjustifiably low.  BP made these material misrepresentations and omissions in, inter alia, its Reports on Form 6-K furnished to the Commission on April 29 and 30 and May 4, 2010.  In these Reports on

2

Form 6-K, BP stated that the flow rate estimates were "up to 5,000 bopd"[1] or that 5,000 bopd was the current estimate, despite higher internal data, estimates, and calculations. At all relevant times, BP knew or was severely reckless in not knowing that it was making these material misrepresentations and omissions to investors.

6.    Information regarding the rate of oil flowing from the well was material to BP's investors. The amount of oil spilled would inform any consideration of the costs of offshore and onshore spill response, claims for natural resource damage under the Oil Pollution Act of 1990 [33 U.S.C. § 2701 et seq.], penalties for strict liability under the Clean Water Act [33 U.S.C. § 1251 et seq.], as well as other potential liability arising from claims, lawsuits, and enforcement actions related to the explosion and the sinking of the Deepwater Horizon.

7.    As a result of the three materially misleading public filings discussed above, BP violated Sections 10(b) and 13(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5, 12b-20, and 13a-16 thereunder. The Commission accordingly seeks a final judgment (a) permanently enjoining BP from violating Sections 10(b) and 13(a) of the Exchange Act [15 U.S.C. §§ 78j(b) & 78m(a)] and Rules 10b-5, 12b-20, and 13a-16 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, & 240.13a-16], (b) ordering BP to pay civil money penalties pursuant to Section 21(d) of the Exchange Act [15 U.S.C § 78u(d)], (c) ordering, pursuant to Section 308 of the Sarbanes-Oxley Act of 2002, as amended by Section 929B of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, that the amount of civil penalties against and paid by BP be added to and become part of a fund for the benefit of American Depositary Shares ("ADS") holders at the time of the violations alleged in this complaint; and (d) granting such other relief as the Court deems just and appropriate.

---

[1]    The acronym "bopd" stands for "barrels of oil per day." A barrel of oil is equivalent to 42 U.S. gallons.

## JURISDICTION AND VENUE

8.     The Commission brings this action pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] to enjoin such transactions, acts, or practices, and to obtain civil penalties and such other and further relief as the Court may deem just and appropriate.

9.     This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), & 78aa].

10.     Venue in this district is proper under Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the transactions, acts, or practices constituting the violations of the federal securities laws alleged herein occurred within the Eastern District of Louisiana.  Also, BP transacts business within the Eastern District of Louisiana.

11.     BP, directly and indirectly, has engaged in transactions, acts, or practices that violate Sections 10(b) and 13(a) of the Exchange Act [15 U.S.C. §§ 78j(b) & 78m(a)] and Rules 10b-5, 12b-20, and 13a-16 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, & 240.13a-16].

## DEFENDANT

12.     BP p.l.c. ("BP") is an international oil and gas company, headquartered in London, England.  BP's U.S. business is based in Houston, Texas.  BP's securities are registered with the Commission pursuant to Section 12(b) of the Exchange Act [15 U.S.C. § 78l(b)] and, in the United States, listed in the form of American Depositary Shares ("ADS") on the New York Stock Exchange under the ticker symbol "BP."  BP's ordinary shares are listed on the London Stock Exchange and the Frankfurt Stock Exchange.  One ADS is equal to six ordinary shares. From April 29, 2010, through May 28, 2010, there were approximately 127,500 ADS holders. As a result of the Deepwater Horizon Incident, the closing price for BP ADS shares declined from $52.56 on April 29, 2010 to $36.52 on June 1, 2010, with over 1 billion ADS shares traded

during this period.   As of June 25, 2012, BP's price per ADS was $37.66.  BP has approximately 19 billion shares in issue (excluding Treasury shares) and a market capitalization of approximately $120 billion.  In 2011, BP had sales and operating revenues of $375.52 billion, a profit of approximately $25.7 billion, and a replacement cost profit of approximately $23.9 billion.  For the quarter ending March 31, 2012, BP had sales and operating revenues of approximately $94 billion, a profit of approximately $5.9 billion, and a replacement cost profit of approximately $4.9 billion.  As a foreign filer, BP is required to file annual reports such as Form 20-F, and to make reports on Form 6-K.

<u>FACTS</u>

I.    **On April 20, 2010, There Was an Explosion on the Deepwater Horizon, and, in the Wake of That Incident, the Federal Government Activated a "Unified Command" to Coordinate Response Efforts.**

13.    On April 20, 2010, there was an explosion on the Deepwater Horizon in the Gulf of Mexico, which was followed by a massive oil spill that affected, <u>inter alia</u>, commercial and other interests in the Gulf of Mexico, other nearby waterways, and the coastal areas of Alabama, Florida, Louisiana, Mississippi, and Texas.

14.    Shortly after the explosion on the Deepwater Horizon, the federal government, pursuant to statutory authority, activated a "Unified Command" to coordinate activities in response to the explosion and resultant oil spill.  Ultimately, the Unified Command included representatives from BP, the U.S. Coast Guard, and the National Oceanic and Atmospheric Administration ("NOAA"), among other entities.

II.    **A Former BP Senior Executive, with No Experience Estimating Oil Flow Rates, Created Spreadsheets That Showed a Flow Rate Close to That Estimated by NOAA.**

15.    On April 26, 2010, a NOAA senior scientist authored a memorandum in which he estimated the flow rate to be 5,000 bopd.  This memorandum was circulated within Unified Command, and was received by at least one Former BP senior executive (hereinafter "Former Senior Executive A") and several BP employees.  BP used the 5,000 bopd figure publicly, and understood that it could have the effect of significantly downplaying the severity of the spill and thus BP's strict liability under the Clean Water Act for barrels spilled, liability for claims under the Oil Pollution Act of 1990, and other liability arising from claims, lawsuits, and enforcement actions.

16.    Former Senior Executive A, who was assigned to the Unified Command and who received the NOAA April 26 memorandum, undertook the task to create a BP flow rate estimate.  Former Senior Executive A had no prior experience calculating oil spill flow rates.

17.    Beginning on April 26, 2010, Former Senior Executive A created, or caused to be created, several spreadsheets that purported to show a "best guess" of flow rate at 5,000 to 6,000 bopd.  In creating this "best guess," Former Senior Executive A – lacking any experience – initially consulted the online encyclopedia "Wikipedia" for guidance, before reviewing more established sources.  Ultimately, Former Senior Executive A developed his own methodology for estimating flow rates, which did not comport with established industry standards.  Former Senior Executive A's application of his methodology was rife with mathematical and procedural inaccuracies.  Despite the inaccuracies and the visual expansion of the spill, the "analysis" in each instance, yielded a desired result:  a "best guess" of the range of flow rate that came close to the April 26 NOAA estimate of 5,000 bopd.

6

18. Although Former Senior Executive A's flawed spreadsheets reflected a range of 5,000 to 6,000 bopd, they also showed a high flow rate estimate of approximately 14,000 bopd.

**III.    On April 28, 2010, the Unified Command Raised its Public Estimate to 5,000 bopd Based, in Part, on Information It Received from a BP Senior Executive.**

19. On April 28, 2010, NOAA's representative within the Unified Command told senior members of the Unified Command that sources within NOAA believed that the flow rate was higher than what had been publicly reported by the Unified Command (1,000 bopd). Upon hearing this, a senior member of the Unified Command approached a then BP senior executive, who was BP's highest ranking officer within the Unified Command (hereinafter "Former Senior Executive B"), and asked for BP's flow rate estimate so the Unified Command could update the publicly disclosed flow rate number.

20. According to a senior member of Unified Command, Former Senior Executive B apparently contacted a BP employee or agent and responded to the senior Unified Command member that BP's internal flow rate estimate was between 1,000 bopd and 5,000 bopd, with 2,500 bopd being the most likely flow rate number. No document exists to support this statement.

**IV.    Statements in BP's April 29, 2010 and April 30, 2010 Commission Filings that the Flow Rate was "up to 5,000" Barrels Per Day Were False and Misleading.**

21. On April 29, 2010, BP furnished to the Commission a Report on Form 6-K in which it addressed the explosion on and sinking of the Deepwater Horizon. In part, BP stated: "Efforts continue to stem the flow of oil from the well, currently estimated at up to 5,000 barrels a day." (Emphasis added.)

22. On April 30, 2010, BP furnished to the Commission a Report on Form 6-K in which it addressed the response effort and stated in part: "Efforts to stem the flow of oil from

7

the well, currently estimated at up to 5,000 barrels a day, are continuing with six remotely-operated vehicles (ROVs) continuing to attempt to activate the blow out preventer (BOP) on the sea bed." (Emphasis added.)

23.     On April 30, 2010, BP published on its website the same materially false and misleading information found in the Report on Form 6-K of that date.

24.     When BP made the statements set forth in paragraphs 21 through 23, supra, it knew them to be false or was severely reckless in not knowing them to be false. By April 28, 2010, BP possessed at least four internal pieces of data, estimates, or calculations and one external calculation that showed potential flow rates significantly higher than 5,000 bopd:

A.     By April 22, 2010, a BP engineer had modeled possible oil flow path scenarios within the well, with corresponding rates between 64,000 bopd and 146,000 bopd.

B.     On or before April 24, 2010, BP was aware of an estimate that showed that immediately following the explosion, oil was flowing through the still-attached riser at a rate of approximately 100,000 bopd.

C.     By April 25, 2010, BP engineers were told of an external analysis of the oil on the water that reached the conclusion that the flow rate could be as high as 10,000 bopd.

D.     On April 27, 2010, a BP engineer estimated the flow to be approximately 5,000 to 22,000 bopd on the basis of temperature readings along the riser pipe, among other factors.

E.     By April 28, 2010, Former Senior Executive A's spreadsheets showed a flow rate ranging from 1,000 bopd to over 14,000 bopd.

8

25.     On April 28, 2010, BP also learned that there was now oil leaking from the "kink," where the riser pipe had bent before it came to rest on the sea floor.  This was an additional separate leak point.

26.     Given that BP possessed data, estimates, and calculations significantly above the 5,000 bopd figure, to publicly disclose (in the two Reports on Form 6-K furnished to the Commission on April 29 and April 30, 2010) that the flow rate was estimated as "up to 5,000" bopd was materially false and misleading.  Failing to disclose even the existence of data, estimates, and calculations that showed a higher flow rate also constituted omissions of material information regarding the flow rate.

**V.     BP Obtained Additional Information Showing a Range of Flow Rates Well in Excess of 5,000 bopd but Nonetheless Furnished Another Report on Form 6-K Citing That Incorrect Estimate, and a Former Senior Executive at BP Continued to Present the <u>5,000 bopd Figure in Statements to the Press.</u>**

27.     Following the fraudulent Report on Form 6-K furnished to the Commission on April 30, 2010, until May 24, 2010, BP generated or was aware of eleven additional pieces of data, estimates, and calculations showing a range of flow rates significantly higher than 5,000 bopd:

        A.     On April 30, 2010, an analysis performed by a BP engineer yielded a range of possible flow rates from 5,000 bopd to 40,000 bopd.

        B.     In early May 2010, a video analysis by a BP engineer resulted in an estimate of 20,000 bopd, attributable just to the riser pipe.

        C.     On May 9, 2010, modeling done by a BP contractor led to a range of possible flow rates from 37,000 to 87,000 bopd.

D. On May 10, 2010, a video analysis done by a BP contractor led to the conclusion that for just oil leaking from the riser pipe, it could not be "ruled out" that the flow rate was "in the order of 40,000 bopd."

E. On or about May 10 and 11, 2010, reservoir modeling done by a BP engineer yielded a range of potential flow rate estimates from 14,000 bopd to 96,000 bopd.

F. From May 14 to May 15, 2010, a critique was authored by a BP engineer of a Purdue University professor's analysis estimating a flow rate of 70,000 bopd. The critique identified what the BP engineer stated were potential errors made by the professor that, when corrected for, yielded a revised estimate of 15,000 bopd, just attributable to the riser pipe, from which the BP engineer stated that a further reduction appropriately could be made.

G. On May 16, 2010, a reservoir-depletion/pressure-drop analysis done by a BP engineer, yielded a flow rate calculation of 86,600 bopd, based on the then-estimated pressure.

H. From May 19 to 20, 2010, a collection of a portion of the oil from the riser pipe with the Riser Insertion Tube Tool (the "RITT") showed average collection rates of approximately 5,000 bopd for a 12-hour period, capturing a portion of the oil leaking from the riser, indicating that the total amount of oil leaking was in excess of 5,000 bopd.

I. On May 22, 2010, an external surface expression analysis showed a range of estimated flow rate from 6,154 to 11,609 bopd.

J.    On May 23, 2010, an analysis created by a BP engineer of the flow rate attributable only to the flow coming from the "kink" in the riser pipe showed an estimate of 11,600 bopd.

K.    On May 24, 2010, the RITT collected approximately 6,100 barrels of oil during the 24-hour period from midnight to midnight, despite the fact that it was not collecting all of the oil emanating from the well.

28.    These eleven additional pieces of data, estimates, and calculations strongly indicated that the range of flow rate was in excess of 5,000 bopd. None of the additional pieces of data, estimates, and calculations suggested that 5,000 bopd was the current estimate of flow rate or that a flow rate of 5,000 bopd was the best estimate.

29.    Former Senior Executive B received at least six of the eleven additional pieces of data, estimates, and calculations. Former Senior Executive A received at least four of the eleven additional pieces of data, estimates, and calculations.

30.    On May 4, 2010, BP furnished another Report on Form 6-K to the Commission, which stated in pertinent part: "Accurate estimation of the rate of flow is difficult, but current estimates by the US National Oceanic and Atmospheric Administration (NOAA) suggest some 5,000 barrels (210,000 US gallons) of oil per day are escaping from the well."

31.    BP omitted from its May 4, 2010, Report on Form 6-K the material fact that, by this date, its own engineers and scientists had generated or received at least six pieces of data, estimates, and calculations regarding flow rate estimates that far exceeded 5,000 bopd. BP also failed to disclose that, based on the internal data, estimates, and calculations, it was not accurate to continue to assert that 5,000 bopd was the best estimate of the amount of oil flowing into the Gulf of Mexico. Similarly, as of this date, for the same reasons, it was misleading to use

11

NOAA's 5,000 bopd as the "best estimate" as the basis for any public disclosure when BP had its own, higher range of flow rate estimates.

32.     Former Senior Executive B made the following public statements during April and May 2010, all of which continued to set forth, inter alia, the 5,000 bopd estimate:

A.     On ABC's "Good Morning America" of April 29, 2010:

Q: [T]he Coast Guard is now saying that it's more likely that 5,000 barrels of oil leaking into the Gulf per day. That's five times the original estimation. Is that your estimate as well?

Former Senior Executive B: Well, we can say based on what's - what we're picking up on the surface, it looks like it is more. So I think something between one and 5,000 barrels a day is a reasonable estimate.

(Emphasis added.)

B.     On CBS's the "Early Show" of April 29, 2010:

Q: This morning, we're learning that the leak from this well is five times worse than originally estimated. Yet, we just heard you say in our report that you don't believe this will change the amount that's estimated to be released into the ocean. I'm not an expert. But how is it possible that four thousand additional gallons leaking a day does not change the equation?

Former Senior Executive B: . . . I should probably explain that on the -- the difference between one and five thousand barrels a day and -- and what we tried to explain is that, what we're seeing through the remote-operated vehicle cameras on the sea floor hasn't actually changed. So, physically those images are the same. And that of course is horribly difficult to estimate what the flow is. But what we can see is the amount of oil on top of the water. And based on the fact of what we're seeing on the surface, that's actually we can almost measure. We can take these aerial views. We think that the range has increased of what the estimate has been. So, I think that somewhere between one and five thousand barrels a day is probably the best estimate we have today.

12

(Emphasis added.)

C.    On NBC's "Today Show" of April 29, 2010:

Q:  So let's get back to numbers here, though, Mr. [Former Senior Executive B].  What do you think is leaking from that?  And is it possible the truth is somewhere in the middle, which would still be a substantially bigger leak that you're predicting?

Former Senior Executive B:  What it is is that thousand barrels a day was a number that the NOAA scientists, working with our own staff, agreed was the best estimate at the time. What we can't do is measure the flow at the seabed.  So as time's gone on, what we [can] see is what's on the surface.  And using the satellite imagery and our overflights, we can now say it looks like it's probably more than a thousand.  It's within the range.  So I actually don't think there's a difference between NOAA's view and our view.  I would say the range is 1,000 to 5,000 barrels a day.

(Emphasis added.)

D.    On ABC's "Good Morning America" of May 14, 2010:

Q:  Don't you need to know the amount and the speed in which it is leaving in order to better contain it?  Isn't that fair to say?

Former Senior Executive B:  Well - Robin, I think, you know, as you said, what we're focused on is, you know, stopping the flow and minimizing the impact.  And since the beginning, we've said, you know, it's, it's almost impossible to get a precise number.  But ourselves and people from NOAA and others believe that something around 5,000, that's actually barrels a day, is the best estimate.  And we look at that. Not only do we, we, we look at what's occurring on the seabed, we look at what's occurring on the surface.  And actually we know that on the good weather days when we can apply all of our tools, we can actually shrink the size of this spill. And those are the, the ways we actually think that that's probably a reasonable number.  But we know it's highly uncertain.

(Emphasis added.)

13

E.    On <u>NBC</u>'s "Today Show" of May 14, 2010:

Q: . . . Scientific experts are questioning whether your company has again underplayed the size of this leak. Some suggest it could be up to 26,000 barrels [of oil], five times a day your current estimate. Are you guessing? And if you don't know the true volume of this leak, how can you stop it?

Former Senior Executive B: Well, Ann, since the very beginning we've said it's highly uncertain. And the two things we can do is we can watch what we observe on the sea floor and we can see what happens on the surface. And what we do know is when we get good weather and can apply all of our techniques, we can actually shrink this spill. We've actually done that. I think the number is probably reasonable. But I can tell you, actually, we're putting every resource against this problem. It isn't related to the amount coming out. We're actually applying everything we can. We've mounted the largest response effort ever done in the world.

Q: But is it possible that you are actually leaking more than 5,000 barrels a day? Yes or no.

Former Senior Executive B: I think, Ann, it could be higher or lower. <u>I don't think it's wildly different than that number, but it could be – we've said since the beginning it could be a bit above or below.</u>

(Emphasis added.)

F.    At a Unified Command press briefing on May 17, 2010:

Q: You said you're hoping that the riser tool could capture perhaps about half of the oil coming out, which I think you said is about 2,000 barrels. Does that mean you know – you're certain how much is actually leaking and that it is about that 5,000-barrel figure we used to hear before? Or, I mean, how do you know actually how much might be captured if you're not sure how much is actually coming out?

Former Senior Executive B: Well, how we'll know how much is captured is, we can actually meter it on board the

14

drill ships. So actually we can measure what's being recovered up there. What we actually don't know is the exact rate on the seabed. We've talked about this a great many times. <u>And that's our best estimate today.</u> Clearly people are constantly asking that question. But I think the thing we always come back to is our response, the Unified Command's response, BP's response to this event, is not dependent upon what that flow rate is. We are responding with everything we have to minimize the impact. And the one thing we will know is the rate that - the amount of oil that comes aboard the drill ship Enterprise that we actually can measure.

(Emphasis added.)

G.    On <u>ABC</u>'s "Good Morning America" of May 21, 2010:

Q: People have really had enough of this. You know, initially, you were saying 5,000 barrels were leaking. Now we can see for ourselves that it's far more than that. Could be - approaching 100,000. Did you deliberately underestimate the size of the spill and mislead the public?

Former Senior Executive B: Robin, you know, from the beginning, we've, we, we've worked with the government on this estimate. In fact, I should actually point out that the 5,000 barrels a day, which we've stated since the beginning, obviously has a lot of uncertainty. That was not just BP's estimate. That was the estimate of the unified command, including NOAA and the Coast Guard. <u>And that's the best estimate we have.</u> We can't put a meter on this thing. We can see what you can see. We can see what's on the surface. But what I can tell you it hasn't impacted what we've done with our response. We've thrown absolutely everything at that. And I think the Coast Guard and others have actually said that.

(Emphasis added.)

H.    At a Unified Command press briefing on May 21, 2010:

Q: . . . And then the second question is, if you don't know the flow rate that's coming from the leak, then how do you know how much material you need to use and at what pressure and what rate you need to jam the well shut using the top kill technique?

15

Former Senior Executive B:  . . . [W]e have done analysis since the beginning about what we believe the rate is and we've talked about that on numerous times.  <u>And we've said since quite early on in this that our best estimate was around 5,000 barrels a day but with a wide range.</u>  And actually as we do design for top kill, that same assessment is what we're designing that (job ?) off of and the same assessment as what we designed the application of dispersants off of as well, subsea.  <u>So at the moment, that's our best estimate,</u> but I would, once again, stress we've said this since the very beginning, there's a huge amount of uncertainty around that number and it could have a fairly wide range.

(Emphasis added.)

I.      On <u>NPR</u>'s "Weekend Edition" of May 22, 2010:

Q:  And how much oil is billowing into the Gulf right now?

Former Senior Executive B:  Well, Scott, I precisely don't know.  We've been trying to estimate the flow since very early on in the spill, and when I say we, it's actually BP, NOAA, the Coast Guard and others.  We can monitor what comes out of that pipe, but that's visual.  It's very difficult to measure that.  There's no meter.  But what we can also do is actually look at the expression of it on the surface, 'cause we can use aerial techniques to try to map how much oil is there and then see how much we collect or burn and the other techniques and look at that difference.  <u>And those are the techniques we use to give an estimate, and 5,000 barrels a day was the best estimate we could do, but we've also stressed since the beginning that that number is very uncertain because we can't meter it.</u>

Q:  Now, you know there's independent scientists who've made their own estimates at NPR's request, and they've come up with a substantially higher figure than 5,000.  They say as much as 70,000 barrels a day.

Former Senior Executive B:  <u>I've heard those [70,000 barrels a day] estimates and seen them and I don't believe it's possible that it's anywhere near that number . . . since I can't meter it, I can't actually say it couldn't be.  But all of our techniques would say that that's highly unlikely.  And I</u>

think some of the reasons these estimates may not be able to accurately calculate is there's a large volume of gas coming out of the end of that pipe with the oil. And in addition to that, we, particularly over the last few days, when we've had very good weather, we've actually seen the size of the spill and the amount of the oil on the surface go down. So those are the things that lead me to believe that those estimates are way too high.

Q: What I'm trying to understand is if, and I will split the difference, but let's say that it's 30,000 barrels a day that are spilling - if you try to top kill, as I guess it's called, seal the leak, cap it off, do you risk using a technique that could make the spill even worse?

Former Senior Executive B: No, I don't believe that's the case, Scott, and we don't think the rate's anywhere near that high.

(Emphasis added.)

## VI.    A Senior BP Engineer Raised Concerns to a Former Senior Executive About Standing by the 5,000 BOPD Estimate.

33.    A BP senior engineer who performed the work that resulted in the estimated range of flow rates from 14,000 to 96,000 bopd set forth in paragraph 27.E., supra, shared his work internally with senior executives, during the second week of May 2010. In the early morning hours of May 15, 2010, the same senior engineer read an article on CNN.com in which BP continued to assert publicly that the flow rate estimate was 5,000 bopd, despite a Purdue University professor's estimate that the flow rate was 70,000 bopd. After reading the article, the senior engineer wrote the following e-mail to a former senior executive within BP's Exploration & Production business segment and a junior executive tasked to support him:

I just read an article in CNN (May 14, 2010 1:00pm) stating that a researcher at Purdue believes that the Macondo well is leaking up to 70,000 bopd and that BP stands by a 5,000 bopd figure. With the data and knowledge we currently have available we cannot definitively state the oil rate from this well. We should be very cautious standing behind a 5,000 bopd figure as our modeling

17

shows that this well could be making anything up to ~100,000 bopd depending on a number of unknown variables, such as: flow path either through the annulus behind the production casing or through the production casing float shoe, the height of reservoir exposed, if drill pipe is suspended in the [blow out preventer] and sealed by [variable bore] rams, reservoir skin damage, choking effects and etcetera. We can make the case for 5,000 bopd only based on certain assumptions and in the absence of other information, such as a well test.

(Emphasis added.)

34. This e-mail failed to spur a discussion regarding whether BP should update or correct the disclosures in its three Reports on Form 6-K.

## VII. The Flow Rate Technical Group Publicly Released Its Final Estimate of Flow Rate at 52,700 to 62,200 Barrels of Oil Per Day, with the Total Oil Spilled As a Result of the Deepwater Horizon Disaster Being Approximately 4.9 Million Barrels.

35. On or around May 19, 2010, the Flow Rate Technical Group ("FRTG"), a group of scientists and engineers from federal agencies and universities charged with creating an estimate of the oil flow from the Deepwater Horizon incident, was created.

36. On May 27, 2010, the FRTG issued its first public report and statement, setting forth flow rate estimates ranging from 11,000 bopd to 25,000 bopd.

37. On June 10, 2010, the FRTG publicly released a second report, in which the flow rate was estimated to be between 12,600 bopd and 40,000 bopd.

38. Five days later, on June 15, 2010, the FRTG publicly released another report estimating the flow rate to be between 35,000 bopd and 60,000 bopd.

39. On August 2, 2010, the FRTG publicly released its final estimate of oil flow rate and amount, concluding that the flow rate ranged from 52,700 bopd to 62,200 bopd during the course of the leak and that approximately 4.9 million barrels of oil flowed from the well overall.

40. BP ADS investors suffered substantial losses following BP's fraud.

18

## FIRST CLAIM FOR RELIEF
### Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

41.    The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 40, inclusive, as if they were fully set forth herein.

42.    Defendant BP, by engaging in the conduct described above, with respect to the Reports on Form 6-K of April 29, April 30, and May 4, 2010, discussed above, knowingly or severely recklessly, in connection with the purchase or sale of securities, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

43.    BP acted knowingly or severely recklessly in connection with the above-described acts and omissions with respect to the Reports on Form 6-K of April 29, April 30, and May 4, 2010, discussed above.  BP knew, or was severely reckless in not knowing, that the above-mentioned filings with the Commission and statements to the public contained material misrepresentations and omissions.

44.    By engaging in the foregoing conduct with respect to the Reports on Form 6-K of April 29, April 30, and May 4, 2010, discussed above, Defendant BP violated, and unless enjoined and restrained will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF
### Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-16 Thereunder

45.    The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 44, inclusive, as if they were fully set forth herein.

46.    Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rule 13a-16 thereunder [17 C.F.R. § 240.13a-16] require, inter alia, a foreign private issuer to make certain periodic and other reports including Reports on Form 6-K.  Exchange Act Rule 12b-20 [17 C.F.R. § 240.12b-20] provides that in addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

47.    By engaging in the foregoing conduct with respect to the Reports on Form 6-K of April 29, April 30, and May 4, 2010, discussed above, Defendant BP violated, and unless enjoined and restrained will continue to violate, Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-16 thereunder [17 C.F.R. §§ 240.12b-20 & 240.13a-16].

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

### I.

Permanently restraining and enjoining Defendant BP from violating Sections 10(b) and 13(a) of the Exchange Act [15 U.S.C. §§ 78j(b) & 78m(a)] and Rules 10b-5, 12b-20, and 13a-16 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20 and 240.13a-16];

20

## II.

Ordering Defendant BP to pay a civil penalty pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

## III.

Ordering, pursuant to Section 308 of the Sarbanes-Oxley Act of 2002, as amended by Section 929B of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, that the amount of civil penalties against and paid by Defendant BP be added to and become part of a fund for the benefit of ADS holders at the time of the violations alleged in this complaint; and

## IV.

Granting such other and further relief as the Court may deem just and appropriate.

Respectfully submitted,

Daniel M. Hawke  (D.C. Atty. Id. No. 424874)
Elaine C. Greenberg
Colleen K. Lynch
G. Jeffrey Boujoukos
Michael J. Rinaldi, T.A. (Pa. Atty. Id. No. 89693)
Brian P. Thomas
Matthew S. Raalf
Kelly L. Gibson
Michael F. McGraw

Attorneys for Plaintiff

Securities and Exchange Commission
701 Market St., Ste. 2000
Philadelphia, Pa. 19106
Telephone: (215) 597-3100
Facsimile: (215) 597-2740
RinaldiM@sec.gov

Dated: November 15, 2012.

21